J-S32015-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: K.N., A MINOR, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: N.K., NATURAL MOTHER, | |
| Appellant | No. 32 WDA 2015 |

Appeal from the Order Entered December 8, 2014
In the Court of Common Pleas of Blair County
Civil Division at No(s): CP-07-DP-0000033-2013

| | |
|---|---|
| IN THE INTEREST OF: K.N., A MINOR, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: N.K., NATURAL MOTHER, | |
| Appellant | No. 33 WDA 2015 |

Appeal from the Order Entered December 19, 2014
In the Court of Common Pleas of Blair County
Orphans' Court at No(s): 2014 AD-53

BEFORE:  SHOGAN, OLSON, and MUSMANNO, JJ.

MEMORANDUM BY SHOGAN, J.:                    **FILED JULY 24, 2015**

N.K. ("Mother") appeals the December 8, 2014 order changing the goal in the dependency case of her daughter, K.N. ("Child"), born August of 2003, to adoption and the December 19, 2014 order involuntarily terminating Mother's parental rights to Child.  We affirm.

We glean the facts of this case from the certified record and the trial court's opinion. Blair County Children, Youth and Families ("CYF") became involved with Child in March 2013 through general protective services due to Mother's bizarre behavior, which included reporting that Child had been kidnapped. During services, Child reported sexual abuse, which led to an investigation and resulted in criminal charges against the paramour of Child's maternal grandmother. CYF established a safety plan for Child, which Mother violated within months by allowing Child to have contact with her maternal grandmother, who lived with the alleged sexual abuse perpetrator. At nine years old, Child requested foster placement due to her exposure to domestic abuse between Mother and Mother's paramour. Despite CYF's attempts to work with Mother through mental health and family services, Mother's mental instability and violation of the safety plan resulted in an adjudication of Child's dependency and placement in foster care on May 2, 2013.

CYF provided treatment and counseling services to assist Child in emotionally managing the sexual-abuse criminal proceedings, the loss of her family, and the transition to foster care. CYF also provided services to Mother, including a psychological evaluation and a referral for drug and alcohol assessment. Over the course of numerous dependency proceedings, Child's goal remained reunification until December 8, 2014, when the trial court determined that Mother had failed to comply with the permanency plan

and could not provide a safe, stable home for Child. Order, 12/8/14, at ¶ 3. Based on the trial court's findings and Child's placement for almost eighteen months, CYF filed a petition for termination of Mother's parental rights on October 9, 2014. After conducting a hearing over three days, the trial court granted CYF's petition on December 19, 2014, involuntarily terminating Mother's parental rights to Child.[1] Mother and the trial court complied with Pa.R.A.P. 1925.

Mother presents the following questions for our consideration:

1. Whether the agency met its burden of proving either that the mother is incapable of performing parental duties, or that she has failed to remedy the conditions which led to her child's dependency placement?

2. Whether termination of parental rights is in the child's best interests, where a bond exists between parent and child, and no clear alternative path to permanency exists?

3. Whether changing the goal to adoption was appropriate, where the mother had made substantial progress toward alleviating the problems that led to placement of her child, and had maintained a strong bond with the child?

---

[1] After the legally presumptive father, W.N., voluntarily relinquished his parental rights to Child, the trial court entered an order terminating W.N.'s rights on December 19, 2014. W.N. has not appealed that order and is not a party to this appeal. Child's biological father, J.W., supported the goal change to adoption and was willing to voluntarily relinquish his rights. However, because J.W. requested that his voluntary relinquishment be contingent on the termination of Mother's parental rights, the trial court did not accept J.W.'s voluntary relinquishment; rather, it entered an order involuntarily terminating J.W.'s parental rights on December 19, 2014. Upon J.W.'s request, the trial court stayed that order until disposition of Mother's appeal to this Court. Order, 2/10/15.

Mother's Brief at 6.

We conduct our review according to the following standard:

> When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

The burden is upon the petitioning person or agency to prove by clear and convincing evidence that its asserted grounds for seeking the termination of parental rights are valid. Moreover, we have explained:

> The standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

The trial court is free to make all credibility determinations, and may believe all, part, or none of the evidence presented. If the findings of the trial court are supported by competent evidence, we will affirm even if the record could also support the opposite result.

*In re J.F.M.*, 71 A.3d 989, 992–993 (Pa. Super. 2013) (internal quotation marks and citations omitted).

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of 23 Pa.C.S. § 2511(a). In this case, the trial court terminated Mother's parental

rights under subsections (1), (2), (5), and (8) of section 2511(a). On appeal, we will focus on subsection (8), which provides as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S. § 2511(a)(8).

On appeal, Mother argues, "The evidence in this case does not clearly establish that [Mother] has failed to address her mental health problems." Mother's Brief at 15. In support of her position, Mother challenges the report of Dr. Marolyn Morford as outdated, incomplete, and inconclusive. *Id.* at 15–16. Additionally, Mother highlights the testimony of her mental health counselor "who testified at the twelve month review hearing, [and] noted that [Mother's] condition had improved." *Id.* at 17. According to Mother, the question of "whether [she] had the capacity to parent her child at the time her parental rights were terminated – remains unanswered." *Id.*

We have discussed the requirements of section 2511(a)(8) as follows:

Section (a)(8) sets a 12-month time frame for a parent to remedy the conditions that led to the [child's] removal by the court. Once the 12-month period has been established, the court must next determine whether the conditions that led to the [child's] removal continue to exist, despite the reasonable good faith efforts of [the agency] supplied over a realistic time period. Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of [agency] services.

*In re J.F.M.*, 71 A.3d at 993 (quoting *In re K.Z.S.*, 946 A.2d 753, 759 (Pa. Super. 2008)).

Here, the first element of section 2511(a)(8) has been met. Child had been in CYF's care for a period of seventeen months from the adjudication of dependency on May 2, 2013, until CYF filed the termination petition on October 9, 2014, and for an additional two months as of the final termination hearing on December 8, 2014.

Addressing Mother's challenge to the evidence and the second element of section 2511(a)(8)—whether the conditions which led to Child's placement continue to exist—the trial court opined as follows:

The dependency record which this [c]ourt incorporated into these orphan court proceedings contains clear and convincing evidence that despite the best efforts of CYF to assist the Mother to remedy the reasons placement occurred, Mother has not gained any stability and continues to struggle to maintain her own existence. The psychosocial report completed by Dr. Marolyn Morford, in October 2013, (Exhibit B-April 14, 2014 hrg.), indicates under *Prognosis*, *page 8* of the report:

7) Mother's prognosis: [Mother's] prognosis is completely dependent upon her cooperation with supportive personal treatment that would address the problem mentioned above as well as her depression and anxiety problems.

Participation [in] random drug/alcohol test[s] would also be important, these are difficult long standing problems that will not change in the very near future. It has been 6 months since her daughter was removed and her assessment here does not indicate much insight.

The dependency record will also reveal that this [c]ourt attempted a positive strength building approach in all [c]ourt proceedings to encourage and engage Mother, in light of her mental health instability, which effort failed, unfortunately, to change any pattern of Mother in the 18 months [Child] remained in care. We recognize the sexual abuse criminal charges created complications as [Child] struggled emotionally in September 2013. Visits with her Mother distressed her and caused nightmares as she relived her abuse and trauma. She also felt guilty for reporting the abuse and causing hurt and harm to her Mother. [Child's] therapist stopped visits with her Mother at that time, however, the goal of visits resumed in April 2014 and [Child] and her Mother had positive interaction however, Mother could not maintain consistency missing approximately 50% of the visits available to her. When the therapist approved visits to continue outside the supervision and assessment of the therapist, the provider CYF assigned to facilitate that contact could not locate the Mother and confirm her permanent residence. In fact, [CYF] had a delay in assigning the provider as they too had encountered the same struggle to maintain contact with Mother before assigning the provider in late August 2014.

Additionally, the final Orphan's Court proceeding on December 8, 2014 indicates the Mother failed to appear without any explanation or contact with the [c]ourt and/or her attorney. Mother attended the first hearing on the Petition to Terminate Parental Rights on October 22, 2014 with counsel. This [c]ourt took testimony from all witnesses except the Mother, due to time constraints. This [c]ourt rescheduled the Termination of Parental Rights hearing for November 12, 2014 at which time Mother failed to appear and her counsel argued for another continuance which the [c]ourt granted.[3] The final hearing on December 8, 2014 indicated through the testimony of the foster Mother that despite the foster Mother's past practice of arranging and providing for direct contact with the Mother and [Child] (with CYF consent) the Mother had not had any contact with [Child] after November 16, 2014. Mother's attorney

affirmed that Mother met with him prior to December 8, 2014 and knew the consequences of the proceedings from his explanation despite perhaps her alleged "confusion". We find all of these facts circumstantially support the fact Mother has not yet found stability or the will to make changes, assert her parenthood and provide permanency for [Child]. In other words, CYF has without a doubt met their burden to establish that Mother's incapacity or refusal has caused [Child] to be without essential parental care necessary for her physical and mental well-being and the conditions and causes of the incapacity and refusal cannot or will not be remedied by the Mother. See23 Pa.C.S.A.2511 Section 2511 (a)(2)(5) & (8)

[3] At the outset of the November 12, 2014 hearing, this [c]ourt denied the continuance; however, at the end of that hearing we granted counsel the opportunity to call Mother and we accepted her word that she did not know of the proceeding until the day before, however she still failed to appear or make contact with her counsel. In an abundance of caution this [c]ourt rescheduled the hearing for November 19, 2014 and Mother's counsel requested another continuance to allow more time for him to meet with Mother before her testimony. We granted that request and reset the hearing for December 8, 2014.

In summary, Mother has demonstrated bizarre and irrational behavior, has never evidenced mental stability and appears to utilize illegal drugs to self-medicate rather than receive treatment.[4] She has not established a permanent residence and continues to reside with [T.S.] with whom domestic violence has occurred. Her strong resistance to change or to take accountability for her actions has continued for over 18 months. Essentially these conditions seriously impair her functioning and parenting skills as noted in the report of Dr. Morford. Based upon this ample record, we find CYF has met its high burden to provide evidence for termination [of] parental rights.

[4] While the therapist facilitated visits between Mother and [Child], Mother lost a great deal of weight and openly showed the track marks on her arms from drug use.

Trial Court Opinion, 3/10/15, at 4–6.

Upon review, we discern support in the record for the trial court's findings. Child was removed by CYF due to concerns related to Mother's mental instability and her violation of the safety plan. Secondary concerns included Mother's drug and alcohol history, poor housing, and allegations of domestic violence. We note some evidence of Mother's progress. According to Mother's mental health counselor, as of Mother's April 3rd and April 10th, 2013 sessions: she "is a lot more calmer, a lot more focused. She has taken the initiative to . . . self-enroll in home nursing agency, drug and alcohol counseling program." N.T., 4/10/14, at 20. However, the record further reveals that Mother did not appear for the initial shelter care or adjudicatory proceedings. N.T., 5/3/13, at 1; 5/10/13, at 1. Moreover, Mother suffers from major depressive disorder and generalized anxiety disorder, and she has a history of drug abuse, inpatient hospitalizations, domestic violence, and noncompliance with services. N.T., 5/10/13, at 26; N.T. 12/19/13, at 38–39; N.T., 7/21/14, at 1–2, 5–15; N.T., 10/22/14, at 19–20, 26–29. Significantly, Mother's visitation with Child was sporadic: "She had about a fifty percent show rate or not and sometimes it was a no-show, sometimes it was cancellation, sometimes it was showing up to a visit for half an hour or more late." N.T., 11/22/14, at 11. With the exception of a family dinner at Pizza Hut in November 2014, Mother did not have visits with Child from July 2014 through the December 8, 2014 hearing. N.T., 11/12/14, at 34–35; N.T., 12/8/14, at 5. Additionally, Mother's whereabouts were sometimes

unknown to CYF, counselors, service providers, and her attorney, which resulted in no contact with her. N.T., 10/22/14, at 26-29; N.T., 11/12/14, at 3.

As for housing, Mother lived between her paramour's home, her own house, which had no running water, and a friend's house. N.T., 4/10/14, at 81–87; N.T., 10/22/14, at 26-29. Caseworkers who visited Mother's residence observed from the outside that it was in poor condition and appeared to be vacant. N.T., 7/21/14, at 40, 45–56; N.T., 10/22/14, at 27, 29. CYF caseworkers were not able to conduct a home inspection because they could not reach Mother, she would cancel the appointment, or she would not show up for the appointment. N.T., 10/22/14, at 25–29, 47–49. On July 31, 2014, an Altoona police officer found drugs and paraphernalia in Mother's residence, multiple pieces of mail addressed to Mother, and he obtained statements from individuals in the home that Mother lived there. The officer also observed that the home was in poor condition, bug infested, with bags of trash overflowing in the kitchen and clutter, clothing, and garbage strewn throughout the house. N.T., 10/22/14, at 14–21. At the time of the termination hearing, Mother did not appear on the second and third dates, despite the trial court rescheduling twice so Mother could testify. N.T., 11/22/14, at 1, 44–50; N.T., 12/18/14, at 1–7.

In light of the foregoing, we discern no abuse of the trial court's discretion in finding that CYF presented clear and convincing evidence that

the conditions which led to the removal or placement of Child continue to exist. 23 Pa.C.S. § 2511(a)(8). The trial court heard from caseworkers and medical experts regarding Mother's ongoing mental instability and inability to care for Child. The trial court was in the best position to assess the credibility of these witnesses. Thus, we conclude that the trial court's legal conclusion—that termination of Mother's parental rights would best serve the needs and welfare of Child—is without error.

Mother's second issue challenges the trial court's bond analysis pursuant to 23 Pa.C.S. § 2511(b). According to Mother, termination would be appropriate, despite bonds, if "substantial, possibly permanent, damage [was] done to [Child] by the prolonged, unhealthy, pathological bond with Mother[.]" Mother's Brief at 19–20 (quoting *In re TSM*, 71 A.3d 251, 271 (Pa. 2013)). Here, Mother asserts, "there is no evidence that the bond with the mother is unhealthy." *Id.* at 20.

Section 2511(b) provides as follows:

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b). As this Court has explained, "Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered." *In re Adoption of C.J.P.*, 114 A.3d 1046, 1054 (Pa. 2015) (quoting *In re K.K.R.–S.*, 958 A.2d 529, 533 (Pa. Super. 2008)). "While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child." *Id.* (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)).

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*N.A.M.*, 33 A.3d at 103 (quoting *In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010)); *see also In re T.D.*, 949 A.2d 910, 920–923 (Pa. Super. 2008) (affirming termination of parental rights where "obvious emotional ties exist between child and parents, but parents are either unwilling or unable to satisfy irreducible minimum requirements of parenthood," and where preserving parents' rights would prevent child from being adopted and attaining permanency).

- 12 -

The trial court addressed section 2511(b) as follows:

We hasten to add that [Child] does indeed love her Mother and as Mother argues, [Child] has a bond with her Mother. We must therefore address whether termination of Mother's rights would best serve the developmental, physical and emotional needs and welfare of [Child] as set forth in Section 2511(b). The record indicates [Child] continued to request and receive contact with her Mother during her placement in her first and now second foster care placements. Other than the length of time from September 2013 – June 2014 where Mother did not have visits with [Child], she has enjoyed phone contact, letters and visits through the foster family and [Child's] therapist as well as CYF contacts at Mother's availability.[5] Mother and [Child] have enjoyed this contact despite the fact that Mother has not had the ability to provide the daily essential care and guidance required of a parent toward a child. We believe this demonstrates that [Child] has the capacity to love her Mother and concurrently recognize her Mother loves her but cannot provide permanency for her. In fact, the testimony indicates that [Child] has adjusted to her second foster family, has bonded to them and has blossomed in her confidence and social skills enabling her to state her needs and accept nurturing. We note once again, at 9 years old at the inception of this case, [Child] requested foster care. She continues to have the added stress of pending criminal charges to deal with the sexual abuse allegations. Until disposition of these charges she continues to need a very consistent, nurturing stable environment to help her manage that difficult experience. In the 18 months of placement, [Child] has demonstrated no adverse consequences of the severed relationship with her Mother. To the contrary, evidence exists that she has begun to heal. We attribute that fact, in large measure, to her foster Mother in light of the fact the foster Mother promotes contact with [Mother] by even coordinating a dinner at Pizza Hut for [Child's] mom and family to maintain contact. This helps [Child] to keep her roots "intact" in a healthy manner as she grows and flourishes in an appropriate setting for permanency. This bodes well for [Child's] long-term emotional well-being, despite the need to terminate rights to remove the limbo of foster care.

[5] Even with the openness of nonjudgmental contact provided by the foster family the Mother did not/could not

establish any regularity or meaningful contact for over six months from July 2014-December 2014.

Trial Court Opinion, 3/10/15, at 6–8.

Upon review, we find support in the record for the trial court's findings. While in Mother's custody, Child was exposed to Mother's unstable mental health, drug issues, and domestic violence. N.T., 5/10/13, at 27, 33–36. Child experienced nightmares and anxiety after visits with Mother. N.T., 11/12/14, at 14, 17, 28. Mother was not supportive of Child with regard to Child's allegations of sexual abuse. N.T., 4/10/14, Exhibit B at 2–3. Child disclosed to her counselor that Mother could not keep Child safe, and Child took the blame for Mother's shortcomings. N.T., 12/19/13, at 21; N.T., 7/21/14, at 24; N.T., 11/12/14, at 17, 28. As of the December 8, 2014 termination hearing, contact between Child and Mother had ceased, with the exception of a family dinner in early November 2014 arranged by Child's foster mother. N.T., 12/8/14, at 5–6. As of the final termination hearing, Child had been in placement for almost twenty months.

In contrast, Child has been in a pre-adoptive home with the "D" family since June 8, 2014. N.T., 11/12/14, at 31–32. According to a CYF caseworker, Child is doing very well with the D family; she has developed a very strong relationship with them and asked if she could call her foster parents "mom" and "dad." N.T., 10/22/14, at 38. Additionally, Child's foster mother provides a unique sensitivity to Child's situation and need to maintain roots, having been separated from her own mother as a child

without getting a chance to meet her mother before her death. N.T., 12/8/14, at 10–11. Consequently, foster mother has encouraged contact between Child and Mother. N.T., 10/22/14, at 38–39. Child indicated that she likes her foster family; she described a positive relationship with foster mother, advised the CYF caseworker that she felt safe in her foster home, and indicated that being adopted by them would be "alright" with her. N.T., 4/10/14, at 53–54; N.T., 7/21/14, at 27–28. According to Child's counselor, if Mother's parental rights were terminated, Child would be able to transition into her pre-adoptive family with whom she has built a strong attachment. N.T., 11/22/14, at 26–27. Moreover, the D family would ensure healthy, appropriate, ongoing contact between Child and Mother in the future. *Id.* at 8–9, 26–27.

In light of the foregoing, we discern no abuse of the trial court's discretion in finding that, although Mother loves Child, she cannot provide permanency for Child. *See In re D.A.T.*, 91 A.3d 197 (Pa. Super. 2014), *appeal denied*, 95 A.3d 278 (Pa. 2014) (holding evidence sufficient to support termination of parental rights even though Mother's testimony revealed that she clearly loves her children). The trial court heard testimony regarding Child's relationship with Mother and her relationship with the pre-adoptive family. The trial court was in the best position to assess the credibility of the witnesses. Thus, we conclude that the trial court's legal conclusion—that termination of Mother's parental rights would best serve the

developmental, physical and emotional needs and welfare of Child—is without error.

Mother's final issue challenges the trial court's order changing the permanency goal to adoption. Mother's Brief at 20. We decline to review this claim. As CYF points out, if the Superior Court affirms the termination of Mother's parental rights, "the issue of the goal change is moot and need not be addressed by the Superior Court." CYF's Brief at 40 (citing **In re M.T.**, 101 A.3d 1163, 1166 (Pa. Super. 2014)). We are affirming the termination of Mother's parental rights. Therefore, her goal change issue is moot. **M.T.**, 101 A.3d at 1166.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/24/2015